IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
(HEARD AT WINCHESTER)

# STATE OF TENNESSEE v. LON MITCHELL PIERCE, JR.

**Appeal from the Criminal Court for Sullivan County**
**No. S38663  R. Jerry Beck, Judge**

---

**No. E1997-00053-SC-R11-CD - Decided June 22, 2000**

**FOR PUBLICATION**

---

The appellant, Lon Mitchell Pierce, Jr, was fleeing from law enforcement officials in a van that another person had stolen in Florida twenty days earlier when the stolen van he was driving collided with a Sullivan County deputy's patrol car.  The deputy died almost immediately from injuries he sustained in the collision.  As a result of the deputy's death, the appellant was charged with and convicted of first degree murder in the perpetration of a theft. In the Court of Criminal Appeals, the appellant challenged the sufficiency of the evidence to support his conviction and argued that the felony murder rule should not be applied because the killing was collateral to and not in pursuance of the felony of theft.  In a split decision, the Court of Criminal Appeals rejected the appellant's claim of insufficient evidence and affirmed his conviction of felony murder.  Thereafter, we granted permission to appeal to determine whether the evidence is sufficient to establish that the murder was committed "in the perpetration of" the theft.  After carefully considering the record and the relevant legal authority, we conclude that the evidence is not sufficient to support the appellant's conviction of felony murder because the killing and the initial theft or taking of the van were not connected in time, place, causation and continuity of action.  Accordingly, the appellant's conviction is vacated and the case is remanded for a new trial.[1]

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Case Remanded for a New Trial**

DROWOTA, J, delivered the opinion of the court, in which ANDERSON, C.J., BIRCH, HOLDER and BARKER, JJ. joined.

---

[1]Oral arguments were heard in this case on March 28, 2000, in Winchester, Franklin County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Donald E. Spurrell and James S. Roach, Johnson City, Tennessee, for the appellant, Lon Mitchell Pierce, Jr.

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, Marvin E. Clements, Jr., Assistant Attorney General, H. Greeley Wells, District Attorney General, and Teresa Murray Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

The events giving rise to this appeal began on November 2, 1995, in Orlando, Florida. On that day, Nora Comacho and her husband stopped their blue 1995 Dodge Caravan at a 7-11 convenience store for gasoline. Passengers in the van included their fourteen-year-old daughter, Sarah Comacho, the appellant, fifteen-year-old Lon Mitchell Pierce, Jr., his sixteen-year-old girlfriend, April Worley, and an unidentified four-year-old child who was temporarily in Worley's care.

Ms. Comacho went into the convenience store and bought her daughter a soft drink. When Ms. Comacho returned to the vehicle, Sarah became upset because the soft drink was in a cup rather than a bottle and she and her mother argued. Apparently as a result of this argument, Sarah jumped into the driver's seat of the van while her father was inside the store and her mother was pumping gasoline. She then hit the automatic door locks and sped away from the convenience store, tearing the hose from the gasoline pump.

An employee of the convenience store immediately notified the Orlando Police Department of the incident. Nora Comacho completed a stolen vehicle affidavit and a sworn written statement,[2] and the employee of the convenience store filled out an incident report with respect to the property damage to the gas pump. Identifying information concerning the stolen vehicle was entered into the computer database of the National Crime Information Center, and a nationwide bulletin was issued reporting the vehicle as stolen.

About twenty minutes after taking the van, Sarah, realizing her inexperience as a driver, pulled over and asked the appellant to drive. The appellant agreed, and immediately drove the four-year-old child to the child's home. Worley then suggested that the trio drive to Bristol, Virginia to visit her grandmother. Worley and the appellant alternated driving and arrived in Bristol, Virginia from Orlando, Florida, approximately twelve hours later.

For the next approximately three weeks, the three teenagers stayed either with Worley's grandmother at her residence in the Rice Terrace Apartments or at local motels. The three spent

---

[2]Nora Comacho advised law enforcement officials that her daughter had taken her vehicle on two prior occasions but that she had not pressed criminal charges against her daughter because eventually the vehicle had been returned unharmed.

their time "mostly [riding] around . . . to different cities [in Tennessee]." During this period, "Sarah [Comacho] got caught shoplifting a Notre Dame jacket from K-Mart in Kingsport." Although the trio was able to escape, they believed that store personnel had obtained the license number of the van. As a result, they located a van of the same color and type as the stolen vehicle they were driving, stole the license plate from that van, and "threw the old plate in the dumpster at a mini-market."

On November 22, 1995, twenty days after Sarah had taken the van from her parents in Orlando, Florida, police officers in Bristol, Virgina, received information that a possible stolen blue Dodge van was located in the Rice Terrace area. At approximately 3:15 p.m., two Bristol, Virginia officers located a vehicle matching that description parked on Buckner Street near the Rice Terrace Apartments. The officers observed for about ten minutes what they believed to be an unoccupied van. When the van pulled out of the parking lot, the officers followed the van, activated their blue lights, and attempted to make a traffic stop when the van failed to stop at an intersection before turning right. Rather than stopping for the officers, the van accelerated, crossed the double line, and passed a school bus that was unloading children. A three minute pursuit ensued through Bristol, Virginia, during which the van driven by the appellant violated numerous traffic laws. When the van crossed out of Virginia into Tennessee, the Virginia officers terminated their pursuit and notified law enforcement authorities in Bristol, Tennessee that the van was approaching.

Locating the fleeing vehicle, Bristol, Tennessee police officer James Breuer activated his emergency lights and sirens and continued the pursuit. Officer Breuer described his pursuit as a low speed chase, approximately forty-five miles per hour in a twenty-five mile per hour speed zone. According to Officer Breuer, the van "would slow down almost to a stop to allow vehicles in front of him to pull over." As the chase continued, Officer Breuer was joined by Lieutenant Danny Baines of the Bristol police department . Once outside the city limits, Captain Daryll Chambers of the Sullivan County Sheriff's Department took the lead in the pursuit. While the Bristol officers continued to follow the van, they deactivated their emergency equipment.

The chase continued through Sullivan County on Route 44 at speeds of twenty-five to sixty-five miles per hour. During the pursuit, officers for both the City of Bristol and the Sullivan County Sheriff's Department were advised by radio broadcasts that the van was possibly a stolen vehicle and that it possibly contained both weapons and narcotics.[3] Approximately fourteen miles into the chase, Sullivan County Deputy Steve Mullins notified Captain Chambers that he was located in front of the pursuit, traveling in the opposite direction and that he would "try to cut them off" somewhere ahead. Shortly thereafter, Captain Chambers was able to see the blue lights from Deputy Mullins' patrol car, approximately four-tenths of a mile ahead. Deputy Mullins had positioned his patrol car diagonally across the roadway to set up a "road block." The front portion of Deputy Mullins' patrol

---

[3]No weapons were found in the van, and there is nothing in the record which reveals the origin of this suspicion. A small amount of cocaine was found in the van, but proof was introduced at trial to establish that the cocaine belonged to April Worley's aunt, and the defendant was acquitted of the charge of possession of cocaine.

car extended approximately two feet over the center line into the lane of oncoming traffic, but enough space remained in that lane for a vehicle to safely maneuver around the patrol car. After creating the "road block," Deputy Mullins exited his car, leaned across the hood, and pointed his service revolver at the approaching van driven by the appellant.

The record does not clearly establish the precise movements of the van after the "road block" became visible. Captain Chambers, immediately behind the van, testified that it slowed down when Deputy Mullins first came into view, and he initially thought the van was going to stop, but in the end, the van drove straight into the front of the patrol car and veered off to the right on impact. Lieutenant Baines, who was the second police car in the pursuit, approximately ten to twelve car lengths from Captain Chambers, testified that the van appeared to veer to the right, away from the patrol car, before impact. Officer Breuer, located in the rear of the pursuit, testified that the van made a sharp turn to the left into Deputy Mullins' patrol car right before the collision occurred.

In any event, when the van struck the patrol car, Deputy Mullins was thrown several feet into the air. His body hit a civilian vehicle that was parked behind the patrol car and then landed hard on the paved roadway. Deputy Mullins died almost immediately of severe head injuries. Following the collision, the van veered off the roadway, rolled onto its side, and came to rest in a field. The appellant, April Worley, and Sarah Comacho were arrested.

Following his arrest, the appellant told police that "[t]he reason I didn't stop was because I was scared . . . all I wanted to do was get on the interstate and get out of the van and leave it there and get away from it. . . ." With respect to the collision, the appellant stated as follows:

> I saw the police car pull out across the road in front of me. He was across his lane and in my lane just a little bit, but I had enough room to go around him in my lane. I was trying to go around him and that's what I wanted to do.
>
> I saw the police officer open his door and he pointed a . . . pistol at the van . . . .
>
> When I saw the pistol, I thought I put my foot on the brake, I'm not sure if I did or not. I let go of the steering wheel and ducked straight down with my arms covering my face. I then heard and felt the crash and knew I'd hit something. I thought I was swerving to the right and would miss the police officer when I ducked my head.

Worley gave a similar account of the accident during her testimony at trial indicating that the appellant yelled, "Duck!" just before the van hit Deputy Mullins' patrol car.

After hearing this proof, the jury found the appellant guilty of first degree felony murder, felony theft of the Dodge caravan, misdemeanor theft of the license plate, and evading arrest.[4] A majority of the Court of Criminal Appeals affirmed the appellant's convictions. However, Judge

---

[4]In this Court the appellant challenges only his conviction of first degree felony murder.

David Hayes filed a dissenting opinion and would have reversed the appellant's conviction of felony murder on the grounds that the evidence was insufficient to show that the murder was "in the perpetration of" the felony because the murder was not committed within the *res gestae*[5] of the felony. Thereafter, we granted the appellant's application for permission to appeal to consider whether there is sufficient evidence to support the conviction of first degree murder "in the perpetration of" the theft.

## Standard of Review

It is well-settled that the proper inquiry for an appellate court determining the sufficiency of the evidence to support a conviction, is whether, "considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. Therefore, on appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. Hall, 8 S.W.3d at 599.

## Discussion

The statute under which the appellant was convicted defines felony murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (emphasis added). The felony supporting the appellant's conviction of felony murder is theft. In Tennessee "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103.

Relying upon Judge Hayes' dissenting opinion, the appellant argues that the evidence in this case is insufficient to support his conviction for felony murder because a murder is committed "in the perpetration of" one of the listed felonies only if the murder occurs within the *res gestae* of the felony. Appellant argues that the murder in this case was not committed within the *res gestae* of the theft because the vehicle was actually stolen by another person in Florida twenty days before the collision resulting in Deputy Mullins' death occurred in Tennessee. Accordingly, the appellant

_____

[5]"The literal meaning of the term 'res gestae' is the thing or things done." 77 C.J.S. 274 (1952). Res gestae is defined generally in criminal law as "the circumstances, facts, and declarations which grow out of the main fact and serve to illustrate its character, and which are so spontaneous and contemporaneous with the main fact as to exclude the idea of deliberation or fabrication." Id.

asserts that the evidence is insufficient to support his conviction for felony murder.

In response, the State argues that the evidence is sufficient to show that the murder in this case was committed "in the perpetration of" theft since the appellant was knowingly exercising control over the vehicle with the intent to deprive the owner of the vehicle and without the owner's effective consent when the collision resulting in Deputy Mullins' death occurred.

This Court has previously considered how the statutory phrase,"in the perpetration of," should be defined in the felony murder context. See e.g. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999); Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879 (1956). For example, in Farmer, this Court explained that for a killing to occur "in the perpetration of" a felony so that the felony murder rule applies, the killing must be done "in pursuance of the [felony], and not collateral to it. In other words, the killing must have had an intimate relation and close connection with the felony. . . and not be separate, distinct, and independent from it. . . . " Farmer, 201 Tenn. at 115-16, 296 S.W.2d at 883 (internal quotations and citations omitted). In addition, there must be a causal connection between the felony and the killing. Farmer, 201 Tenn. at 117, 296 S.W.2d at 884.

More recently we recognized that when determining whether a killing is "in the perpetration of" a felony courts in Tennessee have considered such factors as time, place, and causal connection. Buggs, 995 S.W.2d at 106. We stressed in Buggs that a killing "may precede, coincide with, or follow a felony and still be considered as occurring 'in the perpetration of' the felony, so long as there is a connection in time, place, and continuity of action." Id.

Our research reveals that when determining whether a killing was committed "in the perpetration of" a felony, the majority of courts in other jurisdictions also consider whether the killing and the felony are closely connected in time, place, causation, and continuity of action. See generally Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law, § 7.5(f) (1986); Erwin S. Barbre, Annotation, What Constitutes Termination of Felony for Purpose of Felony-Murder Rule, 58 A.L.R.3d 851, 865-874 (1974); 40 Am. Jur. 2d Homicide § 67 (1999); see, e.g., State v. Mims, 956 P.2d 1337, 1344 (Kan. 1998); State v. Lashley, 664 P.2d 1358, 1368 (Kan. 1983); Commonwealth v. Padgett, 691 N.E.2d 239, 244 (Mass. App. Ct. 1998); State v. Brown, 940 P.2d 546 (Wash. 1997); State v. Wade, 490 S.E.2d 724, 738 (W.Va. 1997). If the felony and killing occur as part of a continuous criminal transaction, the felony murder rule applies. See, e.g., State v. Miles, 918 P.2d 1028, 1033 (Ariz. 1996); Owens v. State, 856 S.W.2d 288, 292 (Ark. 1993); People v. Gimotty, 549 N.W.2d 39, 41 (Mich. Ct. App. 1996); State v. Russell, 503 N.W.2d 110, 113 (Minn. 1993); State v. Trull, 509 S.E.2d 178, 192 (N.C. 1998); State v. Spencer, 725 A.2d 106, 118 (N.J. Super. Ct. App. Div. 1999); Wade, 490 S.E.2d at 738. However, where there is a break in the chain of events between the felony and the killing, the felony murder rule does not apply. See, e.g., Owens, 856 S.W.2d at 292; Lester v. State, 737 So.2d 1149, 1151 (Fla. Dist. Ct. App. 1999); Allen v. State, 690 So. 2d 1332, 1334 (Fla. Dist. Ct. App. 1997); Russell, 503 N.W.2d at 113; Trull, 509 S.E.2d at 192. One of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety. See LaFave & Scott, Substantive Criminal Law, § 7.5(f)(1). If the felon has gained a place of temporary safety after commission of the felony and

before the killing, the felony murder rule generally does not apply.  <u>See, e.g.</u>, <u>People v. Johnson</u>, 7 Cal. Rptr. 2d 23, 26 (Cal. Ct. App. 1992); <u>Allen</u>, 690 So. 2d at 1333; <u>Diamond v. State</u>, 477 S.E.2d 562, 564 (Ga. 1996); <u>Gimotty</u>, 549 N.W.2d at 41; <u>Spencer</u>, 725 A.2d at 118.  Accordingly, in resolving the issue in this appeal, we must evaluate the sufficiency of the evidence to determine if the fatal collision resulting in Deputy Mullins' death and the felony of theft are closely connected in time, place, and causation, and continuity of action.

The State asserts that the killing and felony in this case occurred at the same time and place because the appellant was committing theft by exercising control over the van when the fatal collision occurred.  The State also says that the killing and theft are causally connected because the appellant was attempting to evade arrest for the theft when the fatal collision occurred.  Essentially, the State argues that the felony murder rule can be applied when the underlying felony is theft even if the killing is completely separate from and collateral to the initial <u>taking</u> of the property.  The State's position is that no period of time or intervening events can break the chain between the felony and the killing when the underlying felony is theft. According to the State, so long as a defendant is exercising control over an article of stolen property when an accidental or unintentional killing occurs, that defendant can be convicted of felony murder even if the property was initially stolen twenty years before the accidental or unintentional killing.[6]

We disagree and conclude that in determining whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the initial <u>taking</u> of the property in time, place, causation, and continuity of action.  <u>See</u> <u>Lester</u>, 737 So. 2d at 1151 (holding that the felony murder rule does not apply when the defendant, fleeing from police in a vehicle stolen by another person, collided with another car, killing the driver); <u>Allen</u>, 690 So.2d at 1334 (holding that the felony murder rule does not apply when the defendant, while driving a stolen vehicle, was involved in a car accident that resulted in the other motorist's death);  <u>Doane v. Commonwealth</u>, 237 S.E.2d 797, 798 (Va. 1977) (holding that the felony murder rule does not apply where the defendant stole a car one day and the next day had an automobile accident in the stolen vehicle which resulted in the death of one of the passengers in the stolen vehicle);  <u>Montague v. Commonwealth</u>, 522 S.E.2d 379, 381 (Va. Ct. App. 1999) (holding that the felony murder rule does not apply to a killing that resulted when the defendant, in a vehicle he had stolen the previous day, fled  from police who had attempted to stop him for making a U-turn and struck another vehicle);  <u>cf.</u> <u>State v. Owens</u>, __ S.W.2d __ (Tenn. 2000)(holding that robbery is committed only if the use of violence or fear precedes or is contemporaneous with the taking of property).  This rule applies even in cases, such as this one, where the defendant is charged with theft for exercising control over the stolen property.

_____

[6]According to the State's position, the felony murder rule can be applied to a person who steals a piece of jewelry, retains it in his or her possession for twenty years, and is involved in a car accident twenty years later which results in the death of a police officer.  According to the State , so long as the person has the stolen jewelry in his or her possession at the time of the car accident, the felony murder rule applies.

We note that prior to 1989, larceny, not theft, was listed in the first degree murder statute as one of the felony offenses that would support a conviction for felony murder. Tenn. Code Ann. § 39-2-202 (1982) (repealed 1989). At that time, larceny was defined as "the felonious taking and carrying away the personal goods of another" and therefore required both a "taking and carrying away" of the property. Tenn. Code Ann. § 39-3-1101 (1982) (repealed 1989). Therefore, in determining whether the evidence was sufficient to support a conviction of murder in the perpetration of larceny, courts had to consider whether the killing was temporally, spatially, and causally connected to initial taking of the property. See, e.g., State v. Terry, 813 S.W.2d 420, 423-24 (Tenn. 1991) (discussing the temporal, spatial, and causal connection in the context of the felony murder aggravating circumstance). When the General Assembly enacted the Criminal Sentencing Reform Act in 1989, however, the various larceny-related criminal offenses were consolidated into a single offense of theft of property in order to eliminate "the antiquated and confusing distinctions among various larceny-related crimes ." State v. Byrd, 968 S.W.2d 290, 291-92 (Tenn. 1998). As previously noted, under the statute enacted in 1989, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. After consolidating the various larceny related offenses into a single offense of theft, the General Assembly deleted the word "larceny" from offenses listed in the first degree murder statute that would support a conviction for felony murder and substituted in its place the word "theft." While the General Assembly clearly intended to broadly define the offense of theft under the 1989 Act, there is no indication that by merely substituting the word "theft" for "larceny" in the felony murder statute, the General Assembly also intended to broadly extend the felony murder rule to killings that are completely unconnected to the initial taking of the property.[7]

In the absence of an explicit legislative declaration, we decline to apply the broad definition of theft in the manner suggested by the State because such a holding would extend the felony murder rule to killings that are not connected in time, place, causation, and continuity of action to the initial taking of property. Indeed, such an extension would be illogical in light of the fact that "[o]ne of the original purposes of the felony-murder rule was to deter the commission of certain felonies in a dangerous or violent way." Buggs, 995 S.W.2d at 207 (internal citations and quotations omitted). If the rule is to have any deterrent effect, it must not be extended to killings which are collateral to and separate from the underlying felony. Moreover, requiring a close nexus between the initial taking and the killing is particularly appropriate given that the felony murder rule is "a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder. . . . ." Buggs, 995 S.W.2d at 107.[8]

---

[7]Interestingly enough, the Model Penal Code, from which much of the 1989 Act was derived, does not list either larceny or theft as one of the felonies that will support a conviction of first degree murder. See Model Penal Code § 210.2 (1998).

[8]Our holding relates only to application of the felony murder rule. It does not narrow the definition of theft for purposes of prosecution of that offense nor does it change the analysis courts should apply when determining whether theft is a continuing offense for purposes of jurisdiction.

**Conclusion**

Applying our holding to the facts in this case, we conclude that the evidence is not sufficient to support the defendant's conviction of felony murder. Clearly, the killing in this case was not closely connected in time or place to the taking of the vehicle. The State has never claimed that the appellant initially took the vehicle. Indeed, there is no question that Sarah Comacho actually stole the vehicle more than twenty days prior to the fatal collision from a location more than six hundred miles away from the site of the collision that resulted in Deputy Mullins' death. According to the proof in the record, the appellant and Worley were completely unaware that Sarah intended to take the vehicle without her parents' consent. In addition, there was a break in the chain of events between the initial taking and the killing. As previously stated, one of the most important factors in determining whether there has been a break in the chain of events is whether or not the felon has reached a place of temporary safety. In this case, the appellant reached a place of temporary safety when he arrived and resided in the Bristol, Virginia area for twenty days prior to the killing. The appellant was not being actively and continuously pursued by police during this time, nor was he attempting to hide from the police. Indeed, he, along with Worley and Sarah, were daily driving the stolen vehicle to various cities in Tennessee. Clearly, they had reached a place of safety before the killing occurred. While there was an attenuated causal connection between the initial taking of the vehicle and the killing since the appellant was attempting to evade arrest for theft of the vehicle when the collision occurred,[9] this tenuous causal connection was insufficient in light of the fact that the killing was completely unconnected to the initial taking of the vehicle in time, place, and continuity of action. After considering the evidence in light of the relevant factors, we are constrained to conclude that the evidence is insufficient to support the appellant's conviction of felony murder. Accordingly, the judgment of the Court of Criminal Appeals is reversed. The appellant's conviction of felony murder is vacated, and the case is remanded for a new trial. Costs of this appeal are taxed to the State of Tennessee.

---

[9]The killing was most causally connected to the offense of evading arrest which is not listed as one of the felonies that will support a conviction of first degree murder.